UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| BEDFORD COUNTY EMERGENCY COMMUNICATIONS DISTRICT, *ET AL.*, | ) ) ) | |
| *Plaintiffs*, | ) ) ) | DOCKET NO. 1:14-cv-376 |
| vs. | ) ) ) | Judge Curtis L. Collier |
| LEVEL 3 COMMUNICATIONS, LLC, | ) ) ) | |
| *Defendant*. | ) | |

# **M E M O R A N D U M**

Before the Court is a November 25, 2019, motion for summary judgment by Defendant. (Doc. 117.) Plaintiffs responded in opposition (Docs. 122–24), and Defendant replied (Doc. 133).

On December 19, 2019, after granting in part Defendant's motion to exclude the testimony of Plaintiffs' expert witnesses (Doc. 129), the Court notified the parties that it was considering granting Defendant's motion for summary judgment on grounds other than those Defendant had raised, namely that the now-excluded testimony constituted Plaintiffs' only proof of liability and damages. (Doc. 130.) The Court ordered the parties to file briefs on the issue. (*Id.*) Plaintiffs filed their brief on January 3, 2020 (Doc. 134), and Defendant filed its brief on January 13, 2020 (Doc. 137).

The Court will **GRANT** Defendant's motion for summary judgment (Doc. 117) and **DISMISS** Plaintiffs' claims against Defendant.

## I. BACKGROUND

### A. The 911 Law and Plaintiffs' Complaint

In 1984, Tennessee passed the Emergency Communications District Law, Tenn. Code Ann. §§ 7-86-101, *et seq.* (the "911 Law"), to formally establish 911 as the primary emergency telephone number for all Tennessee residents.[1] The 911 Law created emergency communications districts (the "Districts"), municipal corporations which run the 911 call centers in each county and route calls to the proper emergency service. Tenn. Code Ann. §§ 7-86-104 through 107. To support these functions, the 911 Law allowed the Districts to levy a 911 charge on "exchange access facilities." *Id.* at § 7-86-108(a)(1)(A). As described in Plaintiffs' operative complaint, the 911 Law allowed a charge on "each line capable of transmitting a voice call to a 911 emergency communications district." (Doc. 18 ¶ 40) (citing Tenn. Code Ann. §§ 7-86-103, 108(c), 110).)

Telephone companies, or "service suppliers," were required to act on the Districts' behalves to collect these 911 charges from the companies' customers who fell within the definition of "service users": "any person, corporation, or entity that is provided 911 service . . . ." *Id.* at §§ 7-86-103(15), 103(16), 108(c). The telephone companies were then required to report and remit the 911 charges to the Districts at least every two months. *Id.* at § 7-86-110(a).

This action is one of some twenty similar cases various Districts filed against various telecommunications companies in this Court, seeking to recover 911 charges the Districts believe the telecommunications companies should have collected and remitted to the Districts, as well as statutory damages.

---

[1] A sweeping overhaul of the statute became law on April 25, 2014. 911 Funding Modernization and IP Transition Act of 2014, 2014 Tenn. Pub. Acts 795. Numerous statutory provisions were deleted or relocated within the Tennessee Code after the 2014 amendment. This memorandum refers to the statutory sections as they appeared when the cases were filed.

Plaintiffs, the Districts for fifteen Tennessee counties, brought this particular action against Defendant, Level 3 Communications, LLC ("Level 3"). (Doc. 18.) As limited by the Court's ruling on Defendant's motion to dismiss, Plaintiffs assert causes of action for violations of the 911 Law and the Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 *et seq.* (the "TFCA"). (*See* Doc. 80.)

Plaintiffs have no direct evidence that Level 3 failed to collect any 911 charges it should have collected. They do not, for example, point to any specific customers or categories of customers Level 3 underbilled, or to any provision of the 911 Law Level 3 interpreted incorrectly.[2] Instead, Plaintiffs describe their theory of liability as "A minus B equals C," where "A" is the number of 911 charges Level 3 should have collected for the respective Plaintiffs, "B" is the number of 911 charges Level 3 remitted to the respective Plaintiffs, and the difference, "C"—if a positive number—would show that Level 3 violated its respective duties to Plaintiffs and failed to collect and remit all of the 911 charges it should have.

Plaintiffs' theory of liability relies on Level 3's Wireline Activity Reports to prove the first element of Plaintiffs' formula, the number of lines on which Level 3 should have collected 911 charges for remittance to Plaintiffs from 2004 to 2014.

---

[2] In certain related cases that were dismissed pursuant to a settlement, several of the Plaintiffs in these cases sued BellSouth Telecommunications, LLC ("BellSouth") alleging BellSouth underbilled 911 charges. (*See* Case Nos. 1:11-cv-330, 1:12-cv-3, 1:12-cv-56, 1:12-cv-131, 1:12-cv-138, 1:12-cv-139, 1:12-cv-149, 1:12-cv-166, 1:12-cv-176, and 1:12-cv-186.) In those cases, the plaintiff Districts identified various interpretive disputes under the 911 Law that they alleged showed BellSouth was underbilling 911 charges, such as how multiplex lines should be treated and whether federal government entities were subject to 911 charges. The plaintiff Districts also identified specific alleged billing errors by BellSouth, in addition to broader allegations of underbilling. Plaintiffs have made no interpretive or billing arguments in the cases presently before the Court.

## B. Level 3's Wireline Activity Reports

In 1998, the Tennessee Regulatory Authority (the "TRA") began asking telephone companies, including Level 3, to submit certain data on a monthly basis to help the TRA assess whether a different telephone company, BellSouth Telecommunications, Inc. ("BellSouth"), was complying with federal law on the sale of long-distance services to its local telephone customers. The submission of Wireline Activity Reports was voluntary. According to Eddie Roberson, Ph.D., who was a division chief of the TRA from 1996 to 2006 and a director of the TRA from 2006 to 2011, the TRA used Wireline Activity Reports as evidence of the number of competitors in the long-distance-telephone market and the extent of facilities-based competition in the market. (Doc. 92-6 at 6, 15 [Roberson Rep. ¶¶ 9, 10, 32].) Wireline Activity Reports were not intended to identify the number of lines on which 911 charges should have been assessed, nor is there any evidence of their having been used for that purpose before. (Doc. 92-6 at 14 [Roberson Rep. ¶ 30] ("Wireline Activity Reports had nothing whatsoever to do with 911 charges."); *see also* Doc. 92-4 at 7 [Joseph Gillan Dep. 61:2–8] (Plaintiffs' telecommunications expert not aware of any Tennessee regulator ever using Wireline Activity Reports in connection with 911 charges).)

The following instruction appears on the form on which Wireline Activity Reports were submitted: "Please provide the number of switched voice grade equivalent access lines (64 kbps/4KHz equivalent) including digital and analog, single line and multi-line, that your company has in service in Tennessee in the following categories." (Doc. 109-1.) "Voice grade equivalent access lines" are a unit of measurement based on the size of a telephone communication facility, not a count of actual lines. (Doc. 87-2 at 40 in Case 1:14-cv-370 [Gillan Dep. 51].)

Level 3 has presented evidence that it included significant numbers of lines in its Wireline Activity Reports that were not voice lines or that otherwise could not be used to call 911. Until

4

December 2011, Level 3 based its Wireline Activity Reports on telephone numbers, not lines. (Doc. 92-1 at 8.) In December 2011, Level 3 started using the line-count table from its billing system to complete its Wireline Activity Reports, and those tables "included all types of lines, not just local exchange access lines." (*Id.*) The tables "included such things as data-only, incoming-only, or outgoing-only lines, broadband lines, and private lines." (*Id.*) The tables also "included lines and other services Level 3 provided wholesale to other telecommunication carriers who would then resell those services to the end user." (*Id.*; *see also* Doc. 92-2 at 5–6 [Michael Robles Dep. 292:3–295:19] (between 2004 and 2014, approximately eighty to ninety percent of Level 3's sales were to wholesale-carrier customers rather than individual business customers).)

Level 3 has also presented evidence that its Wireline Activity Reports contained data that was consolidated with the data of other subsidiaries of its parent holding company. (Doc. 92-1 at 7–8.) Thus, Level 3's Wireline Activity Reports were "an amalgam of both Level 3 Communications, Telco, Inc.; Broadwing; and Wiltel's information, so kind of the acquired companies that were jointly under the Level 3 d/b/a." (Doc. 92-2 at 4 [Robles Dep. 27:8–28:4].)

Aside from the expert-witness testimony that was the subject of Level 3's Rule 702 motion, discussed below, and the admissions or inferences advanced in their current brief, Plaintiffs have presented no evidence of their own as to the information Level 3 included in its the Wireline Activity Reports.

### C. Defendant's Rule 702 Motion

Plaintiffs initially intended to call Joseph Gillan as an expert witness to offer the opinion that Level 3's Wireline Activity Reports are an appropriate source of data for the number of lines on which Level 3 should have collected 911 charges. The Court, however, granted Defendant's motion to exclude that opinion under Rule 702 of the Federal Rules of Evidence. (Doc. 129.) The

Court excluded Mr. Gillan's opinion as unreliable because it was not based on sufficient facts and data and there was too great an analytical gap between the data and Mr. Gillan's opinion, in that none of the available evidence tended to show that the Wireline Activity Reports accurately reflect the number of lines on which 911 charges should have been assessed. (Doc. 128 at 12–20.)

Plaintiffs also intended to call a second expert witness, Randall Hebert, C.P.A., to: (i) compare the Wireline Activity Reports to Level 3's contemporaneous reports of the number of lines on which it collected 911 charges, (ii) estimate any missing data from those two sets of reports, and (iii) calculate the amount of Plaintiffs' alleged damages. Mr. Hebert's opinions all depended on the assumption, provided to him by counsel, that the Wireline Activity Reports reflect the number of lines on which Level 3 should have assessed 911 charges. Having excluded Mr. Gillan's opinion that it is appropriate to use the Wireline Activity Reports for this purpose, the Court likewise excluded Mr. Hebert's opinions as unreliable in that they were based on the unsupported assumption that the Wireline Activity Reports show the number of lines on which Level 3 should have assessed 911 charges.[3] (Docs. 128 at 20–21, 129.)

---

[3] Plaintiffs believe that the Court only intends to exclude Mr. Hebert's testimony if Plaintiffs cannot provide evidence to replace Mr. Gillan's excluded opinion that the Wireline Activity Reports reflect lines that could call 911. (Doc. 134 at 13–14 & n.17.) This is incorrect. The Court did not analyze the rest of Level 3's objections to Mr. Hebert's testimony because it was unnecessary. (Doc. 128 at 121.) If there were other evidence to support Mr. Hebert's assumption about the Wireline Activity Reports, the Court would then consider the remainder of Level 3's objections to Mr. Hebert's testimony under Rule 702. These objections include Mr. Hebert's lack of qualifications to engage in statistical estimation of missing data, the work done by another individual who was not disclosed as an expert witness, the failure of Mr. Hebert's predictions to come close to actual data where the actual data was available, and Mr. Hebert's assumption that there was missing data for counties not listed on Level 3's Wireline Activity Reports. The Court reviewed the parties' briefing and the relevant law on these issues in preparation for the *Daubert* hearing, and Level 3's remaining objections to Mr. Hebert's testimony are not insubstantial.

### D. Defendant's Motion for Summary Judgment

On November 25, 2019, before the Court ruled on Level 3's Rule 702 motion, Level 3 filed a motion for summary judgment. (Doc. 117.) Plaintiffs responded in opposition on December 16 and 17, 2019, (Docs. 122–24), and Level 3 replied on December 23, 2019 (Doc. 133).

On December 19, 2019, after granting in part Level 3's motion under Rule 702, the Court notified the parties that it was considering granting Level 3's motion for summary judgment on grounds other than those Level 3 had raised, namely on the grounds that the now-excluded expert testimony appeared to constitute Plaintiffs' only proof of liability and damages. (Doc. 130.) The Court ordered the parties to file briefs on the issue. *See* Fed. R. Civ. P. 56(f)(2) ("After giving notice and a reasonable time to respond, the court may . . . grant the motion [for summary judgment] on grounds not raised by a party.")

In their brief, Plaintiffs argue they should be allowed to submit the Wireline Activity Reports directly to the jury based on certain alleged admissions in Level 3's supplemental answer to Level 3's Interrogatory No. 4.[4] (Doc. 134.) That interrogatory and answer state as follows:

> **INTERROGATORY NO. 4**: Identify and Describe each Policy that You applied and/or followed during the relevant Period for the preparation of Wireline Activity Reports.
>
> **ANSWER:** Level 3 objects to this Interrogatory as not reasonably calculated to lead to the discovery of relevant information as the wireline activity reports submitted to the TRA were a voluntary report provided for general competitive environment monitoring and include numerous types of lines and products that were not subject to the 911 taxes imposed by Plaintiffs' Districts, including, without

---

[4] Although Level 3 produced billing data for one hundred thirty months between 2004 and 2014, listing the services Level 3 provided and the 911 charges it billed, Plaintiffs do not point to any of this data as a way to establish Level 3's liability for underbilling. Plaintiffs previously argued that one subcategory of the data was not complete. (Doc. 109 at 10.) Level 3 disputed Plaintiffs' characterization. (Doc. 113 at 11–12.) Even if Plaintiffs were correct as to one subcategory of billing data, the Court is left with no explanation of Plaintiffs' choice to ignore the rest of what would appear to be the best proof of Level 3's actual billing practices.

limitation, wireless lines, IP-enabled services, federal government lines, lines in excess of the 100-charge cap, lines provided on a wholesale basis to resellers, data-only, incoming–only, or outgoing-only lines, lines not capable of connecting to the 911 PSAP, etc. Subject to and without waiving its objections, Level 3 is unaware of any formal written Level 3 policy regarding the preparation of these reports. Level 3's investigation is ongoing and it will update this response if more information becomes available.

**SUPPLEMENTAL ANSWER:** Without waiving the foregoing objections, Level 3 states that, upon information and belief, prior to December of 2011, Level 3 generated wireline activity reports based upon telephone numbers. Beginning in December of 2011, Level 3 switched to populating the wireline activity reports using the line count table from the billing system. This line count table included all types of lines, not just local exchange access lines. For example, the line count table, and therefore the wireline activity reports, included such things as data-only, incoming-only, or outgoing-only lines, broadband lines, and private lines. The line count table, and therefore the wireline activity reports, also included lines and other services Level 3 provided wholesale to other telecommunication carriers who would then resell those services to the end user – and in such situations, the service address used for the wireline activity reports may represent a default address for Level 3's switch or equipment location and not the address of the reseller or end user. Finally, the wireline activity reports are consolidated, such that they contain lines provided by multiple separate subsidiaries of Level 3's ultimate parent holding company, including entities other than Level 3 Communications, LLC. To the extent non-privileged documents are identified after a good faith, reasonable search that support and/or expand upon this Answer, those documents will be produced by May 1, 2019.

(Doc. 92-1 at 7–9.) Level 3's supplemental interrogatory answers were verified by Level 3 employee Kevin Lanoha, as follows:

Kevin Lanoha declares: I am the lead internal counsel assigned to handle this action for Level 3 Communications, LLC. I have read Defendant Level 3 Communications, LLC's Supplemental Response to Plaintiffs' First Set of Common Interrogatories and I am familiar with its content. Based on the corporate books and records, information furnished to me by employees, and my personal knowledge, I affirm under penalty of perjury that these interrogatory responses are true and correct to the best of my knowledge.

(*Id.* at 36.)

## II. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court must view the evidence, and draw all reasonable inferences, in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

To survive a motion for summary judgment, "the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). Indeed, a "[plaintiff] is not entitled to a trial on the basis of mere allegations." *Smith v. City of Chattanooga*, No. 1:08-cv-63, 2009 WL 3762961, at *2–3 (E.D. Tenn. Nov. 4, 2009) (explaining the court must determine whether "the record contains sufficient facts and admissible evidence from which a rational jury could reasonably find in favor of [the] plaintiff"). In addition, should the non-moving party fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the nonmovant based on the record, the Court should grant summary judgment. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

A court may grant a motion for summary judgment on grounds not raised by a party, as long as the court first gives notice and a reasonable time to respond. Fed. R. Civ. P. 56(f)(2); *see also New Jerusalem Deliverance Church v. Rabette*, No. 10-12566, 2011 WL 1519048 (E.D. Mich. Apr. 20, 2011) (granting summary judgment to defendant on grounds not raised in defendant's motion after giving plaintiff two weeks to respond to new grounds).

### III. ANALYSIS

Plaintiffs argue Level 3 has provided extensive evidence that can establish liability and damages, even without the testimony of Mr. Gillan. Plaintiffs describe this evidence as "Level 3's admissions, its interrogatory responses, the testimony of its designated representative, and other materials in the record." (*See, e.g.*, Doc. 134 at 19.) The only specific pieces of evidence Plaintiffs identify, however, are Level 3's supplemental answer to Interrogatory No. 4 and certain portions of the declaration and deposition of Level 3's corporate representative, Michael Robles. (*See id.* at 4–13.) Plaintiffs say they have other evidence to introduce at trial, but they do not present it for the Court to consider in connection with the present motion. (*Id.* at 1 n.1.) The Court will, accordingly, consider Plaintiffs' arguments in connection with Level 3's supplemental answer to Interrogatory No. 4 and the identified portions of Mr. Robles's testimony.

Given Plaintiffs' continued reliance on the formula of "A minus B equals C" and on the Wireline Activity Reports to supply "A," the pertinent question is whether Plaintiffs have evidence to show that the Wireline Activity Reports show the number of lines on which Level 3 should have collected and remitted 911 charges from 2004 to 2014. Plaintiffs divide their argument into the periods before and after December 2011, when Level 3 changed the way it completed the Wireline Activity Reports.

## A. Before December 2011

Plaintiffs point to three facts about the Wireline Activity Reports before December 2011 which they contend are established by "admission, or at least inference," in Level 3's supplemental answer to Interrogatory No. 4. (Doc. 134 at 5–6.) In response, Level 3 argues Plaintiffs are misreading the relevant language and drawing unreasonable inferences. (Doc. 137 at 9–12.)

First, Plaintiffs argue Level 3 has admitted the phone numbers reported in its pre-December-2011 Wireline Activity Reports were of "local exchange access lines." (*Id.* at 5.) Plaintiffs locate this admission or inference in the following language:

> [P]rior to December of 2011, Level 3 generated wireline activity reports based upon *telephone numbers*. Beginning in December of 2011, Level 3 *switched* to populating the wireline activity reports using the line count table from the billing system. This line count table included all types of lines, *not just local exchange access lines*.

(Doc. 92-1 at 8 (emphasis added).) Plaintiffs argue the statement that the "line count table included all types of lines, not just local exchange access lines," is an admission that the telephone numbers Level 3 used before December 2011 were all "local exchange access lines." (Doc. 134 at 5.)

The Court sees no such admission. Level 3's statement that the line-count table included "all types of lines, not just local exchange access lines," is silent as to the nature of the lines whose telephone numbers Level 3 had used for the reports previously.

Nor can the Court discern a reasonable inference to that effect. An inference is a "conclusion reached by considering other facts and deducing a logical consequence from them." Inference, *Black's Law Dictionary* (11th ed. 2019). The Sixth Circuit Pattern Jury Instructions similarly define an inference as "look[ing] at one fact and conclud[ing] from it that another fact exists." Sixth Circuit Pattern Jury Instructions § 1.05(2) – Consideration of Evidence. The proposition that all of Level 3's telephone numbers were only for local exchange access lines is

11

not a logical consequence of the fact that Level 3's line-count tables included lines that were not local exchange access lines. On the contrary, if any inference could be drawn from this part of Level 3's answer, it would be that some of the telephone numbers Level 3 reported before December 2011 must have corresponded to some of the non-billable lines included in the line-count tables in December 2011 and after, because it would be unreasonable under the circumstances to think that all of the non-billable lines in the line-count table only came into existence in December 2011.

Plaintiffs' proposed inference about telephone numbers would also be unreasonable in light of Level 3's entire answer to the interrogatory. Level 3's original answer, which the supplemental answer augmented, stated that

> the wireline activity reports . . . include numerous types of lines and products that were not subject to the 911 taxes imposed by Plaintiffs' Districts, including, without limitation, wireless lines, IP-enabled services, federal government lines, lines in excess of the 100-charge cap, lines provided on a wholesale basis to resellers, data-only, incoming-only, or outgoing-only lines, lines not capable of connecting to the 911 PSAP, etc.

(Doc. 92-1 at 7.) Moreover, Level 3's tenth general objection stated that "the only type of services Level 3 provides are IP-enabled services. Level 3 does not provide exchange telephone services and is not a service supplier under the . . . [A]ct." (Doc. 92-1 at 4.) Level 3 has also presented evidence that its Wireline Activity Reports consolidated its data with the data of other subsidiaries of its parent company, and this is expressly stated in the same supplemental answer on which Plaintiffs are relying.[5] (Doc. 92-1 at 8–9 [Suppl. Interrog. Answer No. 4] ("Finally, the wireline

---

[5] Level 3 argues its reference to "local exchange access lines" in the supplemental answer is to such lines provided by these other companies. (Doc. 137 at 10.) Plaintiffs argue there is an issue of fact as to whether the Wireline Activity Reports even included the lines of other companies because no other companies' names are listed on the reports, despite Mr. Robles's testimony that that other companies' data was included. (Doc. 134 at 8.) But casting doubt on a witness's

activity reports are consolidated, such that they contain lines multiple separate subsidiaries of Level 3's ultimate parent holding company . . . ."); *see also* Doc. 92-2 at 4 [Robles Dep. 27:8–28:4].) In all, the Court cannot draw from Level 3's answer to the interrogatory an inference, let alone a reasonable one, that each of the telephone numbers Level 3 used in its Wireline Activity Reports before December 2011 represented a Level 3 exchange access line capable of calling 911.

Second, Plaintiffs argue Level 3 has admitted or implied that all of the lines included in the Wireline Activity Reports before December 2011 were subject to 911 charges, because Level 3 specifically identified examples of non-countable lines in the line-count tables it used starting in December 2011, but it did not specifically identify examples of non-countable lines among its telephone numbers. (*Id.* at 5–6 (quoting Doc. 92-1 at 8 ("For example, the line count table, and therefore the wireline activity reports, included such things as . . . [listing specific examples,] [and] also included lines and other services Level 3 provided wholesale to other telecommunications carriers . . . .").) The Court sees no such admission or reasonable inference. As with Plaintiffs' first proposed inference, Level 3's listing of examples of non-billable lines in its line-count tables does not lead logically to a conclusion that there were no non-billable lines represented by the phone numbers it used previously. And also as with Plaintiffs' first proposed inference, the entire answer to the interrogatory and Level 3's tenth general objection provide additional reasons to reject any such inference as unreasonable.

---

credibility is generally not enough to create a genuine issue of fact. *See Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("[A] nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part upon credibility considerations or subjective evidence. Instead, the nonmoving party must present affirmative evidence . . . .") Further, even if a dispute of fact on this point were genuine, it would not be material, because it does not make it more likely that the Wireline Activity Reports accurately reflect the lines on which 911 charges should have been collected.

Third, Plaintiffs argue Level 3 has admitted, in the same supplemental interrogatory answer, that Level 3, itself, "concluded that telephone numbers were a proper measure of the exchange access lines Level 3 supplied to its customers." (Doc. 134 at 6.) The Court cannot accept this argument, either. Level 3's decision, whether mistaken or not, to use telephone numbers to complete a voluntary report, for a different entity, calling for a measurement of its facilities in voice-grade *equivalents*, is not a concession that those telephone numbers had a one-to-one correspondence to exchange access *lines* that could be used to make outgoing voice calls to 911.

Plaintiffs' arguments based on Level 3's supplemental answer to Interrogatory No. 4 fail for another reason. Rule 56 allows a party to support its assertions about facts by citing to interrogatory answers. Fed. R. Civ. P. 56(c)(1)(A). The other party, may, however, "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Level 3 makes such an objection here, opposing Plaintiffs' arguments on the procedural grounds that its supplemental answer to Interrogatory No. 4 is not admissible under Rule 56 because it was made only on information and belief, it was not verified based on personal knowledge, and Plaintiffs cannot introduce it in admissible form at trial because they have not identified any witnesses who could present such testimony. (Doc. 137 at 7–8.) Level 3's objections on these procedural grounds are well founded and form an additional basis for concluding that Plaintiffs' arguments based on Interrogatory No. 4 cannot supply Plaintiffs' missing evidence of liability.

Plaintiffs next argue the deposition testimony and declaration of Mr. Robles confirm the admissions or inferences Plaintiffs locate in Level 3's supplemental answer to Interrogatory No. 4. (Doc. 134 at 6–9.) As discussed above, there are no such admissions or reasonable inferences in the interrogatory answer. Nor do the cited portions of Mr. Robles's testimony get Plaintiffs

14

where they wish to go. Plaintiffs point to testimony that Level 3 sold two products that could carry 911 calls, Enhanced Local Service and Voice Complete or "SIP products," and that 911 charges for those services were billed based on telephone numbers. (Doc. 134 at 6–7.) But the Court cannot reasonably infer from this testimony that all of Level 3's telephone numbers, as counted on the Wireline Activity Reports, should have been subject to 911 charges. Plaintiffs also assert that Mr. Robles "testified that Level 3 billed its customers for Enhanced Local Service using *telephone numbers as the equivalent of lines*." (Doc. 134 at 7 (citing Doc. 134-1 at 21–22 [Robles Dep. 363–64]) (emphasis added).) Mr. Robles's actual testimony was that "on ELS, the 9-1-1 surcharge–9-1-1 charges were assessed based on telephone numbers." (Doc. 134-1 at 22 [Robles Dep. 64].) This is not an admission that telephone numbers are "equivalent" to exchange access voice lines or exclusively represent voice lines capable of calling 911.

Finally, Plaintiffs argue that a table in Mr. Robles's declaration is "a powerful confirmation of the scope of the 'A,' admitting that 40% of all of the lines that Level 3 sold were subject to 911 Charges because they could be used to call 911." (Doc. 134 at 7–8 (citing Doc. 117-19 at 13–14 [Robles Decl. ¶ 21].) Plaintiffs neglect to mention that immediately after Mr. Robles states that "*approximately* 40% of the services Level 3 sold in Tennessee during the period [of 2009 to 2014] were local voice services capable of calling 911," he continues as follows: "[h]owever, more than 99% of those 911-capable services were wholesale services Level 3 sold to other facilities-based telecommunications and VoIP providers." (Doc. 117-19 at 13 [Robles Decl. ¶ 21] (emphasis added).) As the Court held in the related cases against BellSouth, Case Nos. 1:11-cv-330 *et al.*, a telephone company selling services to facilities-based resellers is not responsible for collecting 911 charges on those lines. (Doc. 326 at 18–22 in Case No. 1:11-cv-330.) Plaintiffs' position also overlooks Level 3's uncontradicted evidence that the data of other companies was included in the

15

Wireline Activity Reports. Mr. Robles's statement that approximately 40% of Level 3's services in Tennessee were local voice services capable of calling 911, therefore, does not supply Plaintiffs' missing proof that the Wireline Activity Reports before December 2011 accurately show the number of lines on which 911 charges should have been assessed.

**B.     December 2011 and After**

As evidence that the Wireline Activity Reports in and after December 2011 accurately represent the numbers of lines on which Level 3 should have collected 911 charges, Plaintiffs point to an alleged inconsistency between the way Level 3 describes the reports and the numbers in the reports. (Doc. 134 at 10–13.) They argue Level 3 claims to have started including more lines in its Wireline Activity Reports in December 2011, because the non-billable lines in its line-count tables were supposedly not included among the telephone numbers Plaintiffs used for the earlier reports. Plaintiffs argue this should have made the numbers on Level 3's Wireline Activity Reports go up, but the numbers actually went down starting in December 2011. Plaintiffs ask to be allowed to show this alleged inconsistency to the jury so that the jury may draw the "common sense conclusions" that Level 3 has made false statements about how it completed the Wireline Activity Reports, and that Level 3 changed its method of completing Wireline Activity Reports for the improper purpose of hiding its failure to collect all of the 911 charges it should have.[6]

---

[6] Plaintiffs describe the motivation for this alleged deception as a letter two of the Plaintiffs sent Level 3 in September 2011, notifying Level 3 that they were investigating its reporting and remitting of 911 charges on business lines. Plaintiffs note that Level 3 did not file Wireline Activity Reports in October or November 2011, and resumed filing in December 2011 with a different methodology.

Whatever may have prompted Level 3 to change its Wireline Activity Reports from incorrectly using telephone numbers to using counts of lines, Plaintiffs' theory that Level 3 did so to hide the number of its 911-billable lines hardly seems plausible. Level 3 has produced one hundred thirty months of its actual billing data for the period of 2004 to 2014 in this litigation, but

16

Plaintiffs' position suffers from at least two fatal flaws. First, there is no inconsistency between Level 3's description of its December 2011 reporting changes and the numbers before and after December 2011. Level 3 has explained that the numbers on its Wireline Activity Reports went down in December 2011 because Level 3 went from using telephone numbers—which were massively overinclusive of 911-billable lines—to using line-count tables—which were also overinclusive of 911-billable lines, only less so. (*See, e.g.*, Doc. 137 at 4.) Plaintiffs' argument that Level 3's change from telephone numbers to telephone lines should have increased the numbers on the Wireline Activity Reports by adding non-billable lines is not supported by the evidence. There is, therefore, no genuine dispute of fact as to whether the numbers in the Wireline Activity Reports should have gone up rather than down.

Second and more fundamentally, none of Plaintiffs' arguments about the Wireline Activity Reports from December 2011 on are evidence that the reports are an accurate basis from which to determine how many 911 charges Level 3 should have collected. Thus, even if there were a genuine dispute of fact on this point, it would not be material.

The Court is left with Level 3's evidence that many non-911-billable lines were included in Level 3's Wireline Activity Reports after December 2011, and no evidence for Plaintiff's position that the Wireline Activity Reports are a reasonable reflection of the number of Level 3's lines that were capable of carrying voice calls to 911.

---

Plaintiffs have not used any of it as evidence. Even if the other premises of Plaintiffs' theory were correct, Level 3's alleged scheme to conceal its true liability for 911 charges by manipulating Wireline Activity Reports would only have made sense if the Wireline Activity Reports were the only billing data available. In other words, for such a scheme to have been in any way rational, Level 3 would have to have known in 2011 that Plaintiffs would choose to disregard Level 3's actual billing data in favor of the Wireline Activity Reports in this lawsuit.

## IV. CONCLUSION

Plaintiffs have not shown they have admissible evidence that the Wireline Activity Reports show the number of lines on which Level 3 should have collected and remitted 911 charges from 2004 to 2014. Plaintiffs therefore cannot show that Level 3 violated the 911 Law or the TFCA, and Level 3 is entitled to judgment as a matter of law. The Court will **GRANT** Level 3's motion for summary judgment (Doc. 117) and **DISMISS** Plaintiffs' claims.

**AN APPROPRIATE ORDER WILL ENTER.**

/s/
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**